UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| APRIL RYNIEWICZ, | Case No. 18-11314 |
| Plaintiff, | SENIOR U.S. DISTRICT JUDGE |
| v. | ARTHUR J. TARNOW |
| CLARIVATE ANALYTICS, | U.S. MAGISTRATE JUDGE |
| Defendant. | MONA K. MAJZOUB |

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [14]**

Plaintiff April Ryniewicz commenced this breach of contract and defamation action on April 27, 2018. Before the Court is Defendant Clarivate Analytics' Motion to Dismiss [14] filed on June 29, 2018. Plaintiff filed a Response [15] on July 20, 2018. Defendant filed a Reply [17] on August 3, 2018. The Court held a hearing on the Motion on December 19, 2018. For the reasons explained below, Defendant's Motion to Dismiss [14] is **GRANTED**.

**FACTUAL BACKGROUND**

On May 25, 2009, Thomson Reuters, an IT company, hired Plaintiff to work in its IT and Asset Management Division. In October 2016, Thomson Reuters sold its IP & Science Division to Defendant Clarivate Analytics. At that time, Plaintiff was serving as the Finance Director for IP Management.

In September 2017, Defendant's CEO Jay Nadler and CFO Richard Hanks advised Plaintiff that the company was exploring options for selling its Master Data Center Business. Defendant sought Plaintiff's assistance with completing the sale of the Business and ensuring a smooth transition period. In anticipation of the sale, Defendant presented Plaintiff with a Retention Agreement which set forth incentives to encourage her active participation in helping Defendant with the change in control.[1] These incentives included: a Retention Bonus of $150,000 upon completion of the sale; an award pursuant to Defendant's Annual Incentive Plan ("AIP"); and 26 weeks' severance pay in the event of termination without cause. Plaintiff signed the Retention Agreement on September 20, 2017.

In December 2017, pursuant to her obligations under the Retention Agreement, Plaintiff and her team reviewed Defendant's Master Data Center Balance Sheet. After Plaintiff, in her role as Finance Director, submitted the Balance Sheet to management for final review, the CFO discovered $12 million in unbilled

---

[1] The Retention Agreement provided, in relevant part: "Given your position as Finance Director for IP Management, you are key to the [Master Data Center, Inc.] ("the Business"), and in our view your presence and participation is important to the sale process. Clarivate Analytics has therefore put in place incentives to encourage your active participation in aiding Clarivate Analytics to complete the change in control (as defined below) and to remain employed with the Business during the sale process and at least 6 months after such date as you might begin employment with a purchaser of the Business." Def.'s Ex. A.

revenue. This major accounting error prompted Defendant to hire outside counsel at Latham & Watkins ("Latham") to conduct an internal investigation.

On December 10, 2017, Plaintiff was called into a meeting with Defendant's CFO. Prior to the meeting, Plaintiff was unaware that she had been under investigation by the company and mistakenly believed that the meeting's purpose was to review the Balance Sheet. In reality, however, the meeting was part of the ongoing internal investigation by Latham. Plaintiff alleges that CFO Hanks, represented by Tara Reynolds of Latham, accused her of manipulating financial documents and embezzling $11.3 million from the company. Plaintiff denied the accusations. Plaintiff further alleges that she was questioned for seven hours. Thereafter, Defendant placed Plaintiff on paid administrative leave.

In mid-December 2017, the director of the equity firm that owns Clarivate informed the head of Clarivate's sale agency that sale of the Master Data Center Business would no longer be executed because of Plaintiff's suspected embezzlement.

On December 22, 2017, Plaintiff came into the office for a second meeting. Plaintiff alleges that, in the presence of other attorneys and employees, CFO Hanks again accused her of manipulating financial documents and embezzling $11.3 million. Plaintiff further alleges that, at the meeting, CFO Hanks and Reynolds admitted that "they knew no money was actually missing from Defendant but that it

looked to them that Plaintiff was covering up an accounting error." Amend. Compl. ¶ 31.

Plaintiff was called in for questioning a third time on January 3, 2018. Following the completion of the investigation, Defendant terminated Plaintiff's employment on January 26, 2018. Plaintiff claims that she was terminated without cause and received neither severance pay nor any benefits under the Retention Agreement.

Over the next few months, Defendant informed its potential buyers that the sale was off because of Plaintiff's suspected embezzlement. The sale of Master Data Center Business was never completed.

Plaintiff commenced this action for breach of contract and defamation on April 27, 2018 and filed an Amended Complaint [12] on June 8, 2018. Defendant filed this Motion to Dismiss [14] on June 29, 2018. The Court held a hearing on the Motion on December 19, 2018.

## LEGAL STANDARD

Defendant moves to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, [Plaintiff] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a Rule 12(b)(6) motion to

dismiss, the Court must "assume the veracity of [Plaintiff's] well-pleaded factual allegations and determine whether [she] is entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ANALYSIS

### I. Breach of the Retention Agreement

Plaintiff alleges that Defendant breached the Retention Agreement by terminating her without cause and failing to pay her the $150,000 Retention Bonus, Annual Incentive Plan ("AIP") award, and 26 weeks' severance pay.

The Retention Agreement, governed by Pennsylvania law, sets forth the parties' obligations throughout the transition period. Defendant argues that, even assuming for purposes of this Motion that it terminated Plaintiff without cause, Plaintiff is not entitled to any benefits under the Agreement because their distribution was contingent upon the occurrence of conditions which never took place.

### A. Termination Without Cause

The Retention Agreement sets forth the following termination provisions:

> -The Clarivate Analytics subsidiary that employs you may in its **sole discretion determine that your services are no longer required** prior to the change in control.
>
> -If you **fail to honor any of the commitments** set forth in this letter or under any of your other agreements with and/or obligations to Clarivate Analytics, including but not limited to the Clarivate Analytics Code of Conduct, the Confidential Information and Invention Assignment

Agreement . . . **your employment may be terminated for cause and you will forfeit all payments, benefits and the Retention Bonus under this letter and will not be eligible for severance.** In addition, such payments, benefits, and Retention Bonus will be **subject to your maintaining in strict confidence the contents of this letter**, information related to the potential sale of the Business and the change in control process.

-In the event that your employment with a subsidiary of Clarivate Analytics or a purchaser of the Business is **terminated other than for cause** . . . then, provided you have been in compliance with the conditions set forth in this letter . . . **you will be entitled to receive (i) severance equal to 26 weeks pay at your then current base pay . . . (ii) the pay and benefits described in, and paid in accordance with, paragraphs 2 and 3 . . .** (iii) outplacement support; and (iv) the group medical, dental, and vision benefits . . . .

Def.'s Ex. A ¶¶ 1; 4.

Plaintiff erroneously submits that the Retention Agreement does not authorize Defendant to terminate her without cause, and that Defendant's termination of her employment without cause constitutes a breach of the Agreement. The plain language of the Agreement clearly contemplates termination with or without cause.

First, paragraph one states that her employer, in its sole discretion, may decide Plaintiff's services are no longer needed. Second, throughout the aforementioned termination provisions, the outcomes of both scenarios—termination for cause and termination other than for cause—are addressed. Plaintiff asks the Court to adopt the position that her termination without cause, in and of itself, constitutes a breach of the Agreement. But this argument is simply unsupported by the language in the Agreement. *See Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 89, 559

A.2d 917, 918 (1989) (noting that "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship.").

Defendant properly notes that the issue here is not whether it breached the Retention Agreement by firing Plaintiff without cause; but rather, assuming Defendant terminated Plaintiff without cause, whether Defendant breached the Agreement by denying Plaintiff benefits to which she claims entitlement.

## B. Conditions Precedent

Defendant argues that despite Plaintiff's termination, she is not entitled to the Retention Bonus, AIP award, or severance pay under the Retention Agreement, because these benefits were expressly conditioned upon events which did not occur.

First, "payment, benefits and [the] Retention Bonus [were] subject to [her] maintaining in strict confidence . . . information related to the potential sale of the Business." ¶ 1. According to Defendant, Plaintiff's public filings in this case prohibit her from claiming that she upheld her confidentiality obligation.

Second, "to receive any of the payments or benefits," the Retention Agreement required Plaintiff to execute "a separation agreement and general release." ¶ 5. As Defendant points out, however, neither a separation agreement nor a general release was executed here.

Third, and perhaps most importantly, the Retention Agreement conditioned Plaintiff's entitlement to the Retention Bonus on the sale of the Master Data Plan Business—"[i]n the event no change in control has occurred by September 13, 2018, but your employment with a subsidiary of Clarivate Analytics has been terminated, for any reason, prior to September 13, 2018, you will not be entitled to receive the Retention Bonus or any portion of the Retention Bonus." ¶ 6.

Non-performance of these conditions is fatal to Plaintiff's breach of contract claim. The Retention Agreement makes clear that Plaintiff is not entitled to any portion of her Retention Bonus because no change in control occurred by September 13, 2018 and she was terminated prior to that date. In other words, given that the sale of the Business—the entire purpose behind the Agreement—never happened, Plaintiff cannot claim entitlement to the Retention Bonus.

With respect to Plaintiff's entitlement to an AIP award or severance pay, Plaintiff's receipt of these benefits was conditioned upon the execution of a separation agreement and general release. It is undisputed that no such agreement or release was completed here.

Plaintiff suggests that performance of these conditions was excused because Defendant committed the first material breach of the Retention Agreement by firing her without cause. As previously explained, however, this interpretation is flawed—termination without cause, in and of itself, does not constitute a breach of the

Retention Agreement. Because Plaintiff has failed to allege the execution of a separation agreement for purposes of satisfying the condition set forth in paragraph five, and the sale of the Master Data Plan Business for purposes of satisfying the condition set forth in paragraph six, she has failed to state a claim for breach of contract.

## II. Defamation

Plaintiff alleges that many statements made during the internal investigation regarding her suspected misconduct are defamatory. To state a claim for defamation under Michigan law, Plaintiff must allege:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Mitan v. Campbell*, 474 Mich. 21, 24, 706 N.W.2d 420, 421 (2005). Plaintiff is further required to plead her "defamation claim with specificity by identifying the exact language that [she] alleges to be defamatory." *Ghanam v. Does*, 303 Mich. App. 522, 543, 845 N.W.2d 128, 142 (2014) (internal citation and quotation marks omitted).

Much of Plaintiff's defamation claim is premised on the following statement, allegedly made by several parties during the course of business dealings: "the sale

of the business was off because Plaintiff was suspected of embezzlement of $11.3 million." Amend. Compl. ¶¶ 40a-b; 40d-i; 40n.

This statement is not defamatory. "Michigan law imposes liability only for statements that are *materially* false." *Jones v. Scripps Media, Inc.*, No. 16-cv-12647, 2017 WL 1230481, at *7 (E.D. Mich. Apr. 4, 2017) (internal citation omitted). But Plaintiff has neither alleged, nor can demonstrate, that these statements were false. Notably absent from the Amended Complaint are allegations indicating that she was *not* being investigated by the company for embezzlement. *See Turaani v. Sessions*, 316 F. Supp. 3d 998, 1010 (E.D. Mich. 2018), *reconsid. denied,* No. 17-cv-14112, 2018 WL 3968614 (E.D. Mich. Aug. 20, 2018). Because Plaintiff was in fact being investigated for, and suspected of, embezzlement, the statement cannot form the basis for her defamation claim.

Moreover, the statements made by Renee Darragh and Kimberly Burow that "Plaintiff was terminated for embezzling $11.3 from the company," Amend. Compl. ¶¶ 40j-k, are also not alleged to have been false. In the Amended Complaint, Plaintiff omitted the reasons for her termination in order to support her claim that she was terminated without cause. Any reasonable interpretation of the Amended Complaint, however, compels the conclusion that Defendant fired Plaintiff because it

determined, based on its internal investigation, that she had embezzled money from the company.²

The other allegedly defamatory statements similarly fail to support Plaintiff's claim for relief. Plaintiff's general allegations that she was "falsely accused of embezzlement," Amend. Compl. ¶¶ 25; 29, and that she had "sexually inappropriate conversations" with her former supervisor, Amend. Compl. ¶ 40l-m, fail for lack of specificity since Plaintiff has not identified the exact language she alleges to be defamatory. *See Ghanam*, 303 Mich. App. at 543.

Finally, to the extent that Janice Read's statement that "Plaintiff manipulated Defendant's books and embezzled $11.3 million from Defendant," Amend. Compl. ¶ 37, can be construed as satisfying the specificity requirement, the statement does not constitute an "unprivileged communication to a third party." *See Whiting v. Allstate Ins. Co.*, 433 F. App'x 395, 397 (6th Cir. 2011).

In Michigan, "employers have a qualified privilege 'to defame an employee by making statements to other employees whose duties interest them in the subject matter.'" *Id.* at 398 (quoting *Gonyea v. Motor Parts Fed. Credit Union*, 192 Mich.

---

² Even assuming that Plaintiff was not terminated for embezzlement thereby rendering the statements false, Plaintiff still cannot establish a defamation claim. Plaintiff has neither alleged that Darragh and Burow acted negligently in telling other employees about her termination nor that they knew, or had reason to know, that she was fired for any reason other than embezzlement.

App. 74, 480 N.W.2d 297, 299 (1991)). "Consistent with the imperatives of managing a company, to say nothing of common sense, supervisory employees thus may discuss . . . allegations . . . [and] make appropriate inquiries . . . without violating the defamation laws." *Id.* (internal citation and quotations marks omitted).

Janice Read—Clarivate's corporate counsel—had a duty to communicate her investigatory findings to her co-counsel and her clients. *See Rondigo, L.L.C. v. Twp. of Richmond, Mich.*, 522 F. App'x 283, 287 (6th Cir. 2013). Because Read made the statement during the course of the investigation, it is protected by qualified privilege.

Plaintiff may overcome the qualified privilege only by alleging "actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Smith v. Fergan*, 181 Mich. App. 594, 597, 450 N.W.2d 3, 5 (1989). But Plaintiff has not alleged any facts to support an inference of malice by Read. The Amended Complaint is devoid of allegations concerning the internal investigation which could even suggest that Read acted with reckless disregard of the truth upon disclosing her findings. Because none of the alleged statements are actionable, the Court dismisses Plaintiff's defamation claim.

## Conclusion

The Amended Complaint fails to state a plausible claim for breach of contract and defamation. With respect to her contract claim, Plaintiff has failed to establish that Defendant breached the Retention Agreement by withholding the Retention

Bonus, AIP award, and severance pay. Furthermore, with respect to her defamation claim, Plaintiff has neither alleged the defamatory statements with specificity nor established that the statements were materially false.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Dismiss [14] is **GRANTED**.

**SO ORDERED**.

<br>

Dated: January 24, 2019

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge